Davis *v.* State.

(Division B. June 9, 1930.)

[128 So. 886. No. 28487.]

670

T. E. Mortimer, of Belzoni, for appellant.

George T. Mitchell, Attorney-General, and Forrest B. Jackson, Assistant Attorney-General, for the state.

**Ethridge, P. J.,** delivered the opinion of the court.

Velma Davis, the appellant, was indicted, tried, and convicted for the murder of one Nettie Vale, and sentenced to a life imprisonment in the state penitentiary.

It appears that the appellant, Velma Davis, had married one Robert Davis some time prior to the killing in question. Prior to that marriage, Robert Davis and Nettie Vale had lived together in illicit relations and she had borne one child to Robert Davis. After the marriage to the appellant, Nettie Vale was sent away and she went to the state of Arkansas, but returned to the state of Mississippi shortly before the killing, and went to Robert Davis' place, and he told her that she could not live there any more, but he and the appellant agreed to take the child and take care of it. Nettie Vale went to a neighboring house, and it appears that Robert Davis went to that house on the night of the killing and was talking to Nettie Vale at the time she was shot by the appellant.

Claud Matlock and his wife were witnesses for the state. Claud testified that they all sat upon the porch of the house a little bit after Robert Davis came there, and then he and his wife went into the house leaving Nettie Vale and Robert Davis on the porch; that Velma Davis came up dressed in men's clothes, and he (Claud Matlock) did not recognize her at first, and she asked if Robert Davis was there and he stated he did not know. That the appellant then passed the window through which she had been talking to Claud Matlock, and went

around toward the front of the house, and he heard a shot fired; that the defendant, Velma Davis, never said anything to Nettie Vale and Robert Davis; that the deceased, Nettie Vale, was shot in the back; that when Velma Davis fired, he (Claud Matlock) jumped up and ran on the porch and "Mr. Davis and Velma were wrestling with the shotgun" and that he (Claud Matlock) took the shotgun and gave it to his wife, and that Velma Davis walked down the road a little way and got out in the cotton patch, and that Robert Davis, her husband, said: "Stop that damn bitch, she has killed this girl." This statement was objected to by the appellant, and his objection was overruled by the court. The wife of Claud Matlock testified to the same statement as her husband, and that constituted one of the assignments of error.

It appears that Nettie Vale, on the return trip from Arkansas, had stated to a witness that she was going back and run Velma Davis off, and that the witness asked her the question, "What, if she does not run? and that she said she would run her off or kill her, and that he communicated this threat to Velma Davis before the killing." Velma Davis testified that this threat had been communicated to her, and on the evening that her husband left home she put the children to sleep and took the gun and went down to Matlock's place; that she took the gun for protection, and that she asked Matlock if Robert Davis was there, and he said he did not know, and that she heard Robert Davis and Nettie Vale talking on the porch, and that she stepped around there where they were and Nettie had her arms around her husband and was kissing him, and that she, Velma Davis, stumbled her foot against a can, and when she made a noise Nettie Vale jumped and reached for something on the porch, which she could not see, but supposed to be a weapon, and that she, Velma Davis, fired a shot which shot killed Nettie Vale, under the belief that her life was in danger.

It is also in the testimony for the state that a day or two after the arrest, the appellant made a statement to the deputy sheriff and a newspaper reporter, when asked by them for a statement, saying there was but little to say except that she killed Nettie Vale, but she did say that Nettie Vale did not see her until after the shot was fired.

Neither side requested an instruction for manslaughter, but, in one instruction for the state, the court charged the jury, in substance, that there was no particular period of time necessary in order for malice to exist, or during which the defendant should have contemplated the killing, and that if the intent to kill or do some great bodily harm is executed the instant it springs into the mind, the offense is as truly murder as if it had dwelt there for a longer time, unless the jury should believe, from all the evidence, that the killing was manslaughter, or was done in necessary, or apparently necessary self-defense.

It is urged that, inasmuch as the state referred to manslaughter in this instruction, it was under the duty to ask an instruction to find manslaughter, or tell what constitutes manslaughter. The defendant did not ask for a manslaughter instruction, and therefore she is not in a position to complain until she has asked for such, and has been refused.

Under our system of law the court cannot give an instruction not requested by one of the parties to the litigation.

We find no reversible error in this instruction.

The defendant asked and was refused an instruction reading as follows: "The court, at the request of the defendant, instructs the jury that if you believe from the evidence that at the time of the shooting of Nettie Vale by the defendant the mind of the defendant from any cause was in such a condition as to be incapable of form-

ing a premeditated design or deliberating coolly, then the defendant is not guilty of murder."

The refusal of this instruction was not error, because there is no testimony to show that the defendant was in an exasperated state of mind or that her reason was overthrown at the time of the killing. Her testimony of the transaction was clear and shows that she was not in a frenzy of passion such as would overthrow her reason. It is manifest that the defendant was seeking by this instruction to present a theory that could make manslaughter without taking the consequences that result from such a finding, and was leading the jury, by implication, to the belief that the defendant was guilty of nothing if in such a state of mind. It is true the instruction says not guilty of murder, but it did not carry a true conception of the law that applied to such situation, and there was no error in refusing it as asked.

We are, however, of the opinion that the statement made by the husband just after the killing was incompetent. In the first place it was after the transaction was completed, the appellant disarmed, and going away, and in the second place the statement was by the husband of the appellant, and any statement by him, even if of the res gestae, would be incompetent. The statement is a very damaging one and is not merely a statement of admitted fact of the killing, but contains a characterization that indicates an outraged state of mind on the part of the husband, and is such that would indicate a low estimate of appellant's character. In Pearson v. State, 97 Miss. 841, 53 So. 689, 690, among other things, the court held that a charge made by a defendant's wife, accusing him of a rape since the wife could not have testified against her husband, was error. In the opinion of the court in that case in reference to this matter it is said that: "In the course of the trial, over the strenuous objection of the appellant, the court permitted the prosecutrix and her sister, Nannie Pearson, to testify to cer-

tain conversations and charges, including the charge of this offense, made against the appellant by his wife. This was a most flagrant error, as distinctly held in Garner v. State, 76 Miss. 515, 25 So. 363. The wife could not have been introduced herself to testify that she had charged defendant with the crime; and, a fortiori these witnesses could not testify that their mother had accused him. This was fatal error.''

In the case of Garner v. State, 76 Miss. 515, 25 So. 363, referred to in the court's opinion above, in the second syllabus, it is said: ''Whatever is improper to be proved directly cannot rightfully be proved by indirection.''

We are unwilling to engraft any exception upon the statute making the husband or wife an incompetent witness against each other, and, for the admission in evidence of the statement of the husband shortly after the killing, the judgment must be reversed, and a new trial granted.

Reversed and remanded.